UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EMPLOYER-TEAMSTERS LOCAL NOS. 175 & 505 HEALTH & WELFARE FUND, on Behalf of Itself and All Others Similarly Situated, | ) ) ) ) | Civ. Action No. |
| | ) | <u>CLASS ACTION</u> |
| Plaintiff, | ) ) | COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS |
| vs. | ) ) | |
| FMC CORPORATION, MARK A. DOUGLAS, and ANDREW D. SANDIFER, | ) ) ) | |
| Defendants. | ) ) | |
| | ) | <u>DEMAND FOR JURY TRIAL</u> |

Plaintiff Employer-Teamsters Local Nos. 175 & 505 Health & Welfare Fund ("plaintiff"), on behalf of itself and all others similarly situated, by plaintiff's undersigned attorneys, for plaintiff's complaint against defendants, alleges the following based upon personal knowledge as to plaintiff and plaintiff's own acts, and upon information and belief as to all other matters based on the investigation conducted by and through plaintiff's attorneys, which included, among other things, a review of certain U.S. Securities and Exchange Commission ("SEC") filings and press releases by FMC Corporation ("FMC" or the "Company"), Company earnings calls and presentations, and analyst and media reports about the Company. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a securities class action on behalf of all purchasers of FMC common stock between November 1, 2022 and October 30, 2023 (the "Class Period"). Plaintiff seeks to pursue remedies against FMC and certain of the Company's senior executives under §§10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), and Rule 10b-5 promulgated thereunder.

2. FMC is an international manufacturer of agricultural products consisting of herbicides, insecticides and miticides, fungicides, harvest aids, and other crop chemicals used for seed corn, potatoes, sorghum, sweet corn, cotton, tobacco, sunflowers, grapes, and other related products. FMC relies upon its various patents and other intellectual property to ward off competition and to generate revenue and support its market position.

3. FMC's core business involves the sale of its flagship diamide products, a type of insecticide, which FMC sells directly to customers and through licensed partners. FMC generated approximately $2.1 billion, or 36% of the Company's total revenues, and approximately 60% of its EBITDA, from the sale of diamides during 2022.

4.      FMC acquired the patented diamides from DuPont in 2017 and markets them as "Rynaxypyr" and "Cyazypyr."  Rynaxypyr, which is one of the best-selling insecticides in the world, is the brand name for the diamide chemical chlorantraniliprole, commonly referred to as "CTPR."

5.      Throughout the Class Period, defendants made positive statements about FMC's diamides business, lack of meaningful competition, and growth prospects.  FMC represented that a core tenet of its success was the high quality of its diamides products and the purported inability of other companies to sell competing products to FMC's customers because of FMC's strong intellectual property rights and the Company's aggressive strategy of enforcing those rights around the world.  According to defendants, even though FMC's primary patents on its leading CTPR insecticide had expired in 2022, it had "process" patents so FMC would not face legal generic competition of CTPR in its key markets in India, China, and Brazil until 2026, at the earliest.

6.      Unbeknownst to investors, however, defendants knew, or recklessly disregarded, that FMC was vulnerable to a wave of generic competition in India, China, and Brazil because of a series of legal and regulatory setbacks related to FMC's patents.  Indeed, at the same time defendant Andrew D. Sandifer assured investors that "there's not a single legal competitor in Rynaxypyr in the world today" and that "there are no current legal entrants" in India or China, dozens of competitors were selling generic versions of CTPR in India and China for prices much lower than FMC's products.  Furthermore, FMC's competitors were on the verge of entering the critical Brazilian market.  As a result, FMC's business and prospects were much worse than represented by defendants, causing the price of FMC common stock to trade at artificially inflated levels during the Class Period.

7.      On September 7, 2023, an investment firm issued a report on FMC which revealed – for the first time – that FMC had lost key patent disputes in Asia and Brazil and that FMC faced substantially more generic competition than previously represented by the Company.  In response to

the disclosure of facts in the investment report, the price of FMC common stock fell from $82.19 per share on September 6, 2023 to close at $76.10 per share on September 7, 2023, a decline of $6.09 per share, or 7%, on heavy trading volume of over seven million shares traded. Over the next two trading days the price of FMC common stock continued to decline, closing at $73.87 per share on September 11, 2023, a decline of $8.32 per share, or 10%, from its closing price on September 6, 2023.

8.      On October 23, 2023, FMC issued a press release revising downward the Company's third quarter 2023 expectations and full-year 2023 outlook, "mainly driven by substantially lower sales volumes in Latin America, particularly destocking in Brazil." This disclosure corroborated certain aspects of the investment report issued on September 7, 2023. In response, the price of FMC common stock fell from $66.95 per share on October 20, 2023 to close at $58.12 per share on October 23, 2023, a decline of $8.83 per share, or 13%. The price of FMC common stock continued to decline over the next two trading days, closing at $55.77 per share on October 25, 2023.

9.      Then, on October 30, 2023, FMC issued a press release announcing its financial results for the third quarter of 2023, including a 29% revenue decline in the quarter. FMC attributed the decline in part to lower customer demand in Brazil and a decline in sales in Asia, largely due to lower customer demand in India. On this news, the price of FMC common stock fell from $57.96 per share on October 30, 2023 to close at $53.20 per share on October 31, 2023, a decline of $4.76 per share, or 8%, on heavy trading volume of over three million shares traded.

10.      As a result of defendants' fraudulent scheme, as detailed herein, plaintiff and other members of the Class (defined below) have suffered substantial economic losses and damages under the federal securities laws.

## JURISDICTION AND VENUE

11.    The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5, promulgated thereunder, 17 C.F.R. §240.10b-5.

12.    This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act, 15 U.S.C. §78aa.

13.    Venue is proper in this District pursuant to §27 of the Exchange Act and 28 U.S.C. §1391(b) because the statements that form the subject of this complaint were disseminated into this District and the Company maintains its corporate headquarters in this District.

14.    In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

15.    Plaintiff Employer-Teamsters Local Nos. 175 & 505 Health & Welfare Fund, as set forth in the accompanying certification, which is incorporated by reference herein, purchased FMC common stock during the Class Period and has been damaged thereby.

16.    Defendant FMC is an agricultural sciences company headquartered in Philadelphia, Pennsylvania.  The Company's common stock is listed on the New York Stock Exchange ("NYSE") under the ticker symbol "FMC."

17.    Defendant Mark A. Douglas ("Douglas") served as the Company's President and Chief Executive Officer ("CEO") and a member of the Company's Board of Directors at all relevant times.

18.    Defendant Andrew D. Sandifer ("Sandifer") served as the Chief Financial Officer ("CFO") and an Executive Vice President at the Company at all relevant times.

19.    Defendants referenced above in ¶¶17-18 are referred to herein as the "Individual Defendants."  The Individual Defendants and the Company are referred to herein as "defendants."

20.     Each of the Individual Defendants was directly involved in the management and day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, services, competition, and present and future business prospects.  In addition, the Individual Defendants were involved in drafting, producing, reviewing, and disseminating the false and misleading statements and information alleged herein; were aware of, or recklessly disregarded, the false and misleading statements being issued regarding the Company; and approved or ratified these statements, in violation of the federal securities laws.

21.     As officers and controlling persons of a publicly held company whose securities are registered with the SEC pursuant to the Exchange Act and traded on the NYSE, which is governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate, truthful, and complete information with respect to the Company's operations, business, services, markets, competition, and present and future business prospects.  In addition, the Individual Defendants each had a duty to correct any previously issued statements that were materially misleading or untrue, so that the market price of the Company's publicly traded shares would be based upon truthful, accurate, and complete information.  Defendants' false and misleading misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

22.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to, and did, control the contents of various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be false and/or misleading before or shortly after their issuance, participated in conference calls with investors during which false and misleading statements were made, and had the ability and

opportunity to prevent their issuance or cause them to be corrected. Accordingly, each Individual Defendant is responsible for the accuracy of the public statements detailed herein and is, therefore, primarily liable for the representations contained therein.

## SUBSTANTIVE ALLEGATIONS

**Prior to the Start of the Class Period, FMC Repeatedly**
**Emphasized FMC's Purported Enforcement of Its Patents**
**and the Lack of Generic Competition Facing the Company**

23.    Prior to the start of the Class Period, FMC repeatedly issued press releases and made public statements to investors when it filed suit to enforce its patent rights and when it successfully defended its patents against potential competitors seeking to manufacture or sell generic diamides. In fact, successfully defending FMC's patents and preventing competition from generic manufacturers were such essential parts of FMC's business strategy that an entire section on FMC's website lists news concerning the Company's "Brand Protection" efforts.

24.    For example, on July 7, 2021, FMC issued a press release titled "FMC Corporation Granted Interim Injunction Against Agricultural Chemicals Manufacturer Natco for Patent Infringement." The release announced that the "Delhi High Court . . . granted the company an interim injunction against NATCO Pharma Limited ('Natco')," which "restrains Natco from manufacturing, using, distributing, advertising, exporting, offering to sell and/or selling any product which contains chlorantraniliprole, FMC's leading insect control active ingredient." In the release, Michael Reilly, executive vice president, general counsel, and secretary of FMC, stressed that FMC would use litigation to defend itself against generic competition, stating: "'FMC Corporation invests heavily in research and development . . . [and] will pursue all appropriate measures as permitted under Indian laws to aggressively defend FMC's intellectual property and safeguard farmers' interests.'"

25.    On August 4, 2021, FMC represented to investors in a presentation that the "First Potential Competitive Sales of Cyantraniliprole" were not expected until the first quarter of 2026 in

China and India at the earliest and not expected until the third quarter of 2026 in Brazil.  In that presentation, FMC also emphasized its efforts to enforce FMC's intellectual property, stating: "FMC will aggressively enforce its patent estate on the diamides and all other intellectual property/regulatory rights."  The presentation highlighted that FMC had: (i) "[o]btained injunctions and/or settlements against six (6) separate infringers in India"; (ii) "[f]iled four infringement cases in China"; (iii) obtained an injunction against Brazilian regulators, "which will postpone action on all potential generic applications filed while [FMC's] data exclusivity was still in force"; and (iv) taken actions in China that had "greatly reduced promotion of infringing products by generic producers," causing "potential generics [to] becom[e] much more cautious."

26.    On September 13, 2021, FMC issued a press release titled "Court rules in FMC Corporation's favor in patent infringement case against Shandong Weifang Rainbow Chemical Co. Ltd."  The release stated that FMC was victorious in a patent litigation against a competitor in China for CTPR, stating in pertinent part as follows:[1]

> Qingdao Intermediate Court in China has ruled in its favor in the chlorantraniliprole patent infringement suit against Shandong Weifang Rainbow Chemical Co. Ltd. ("Rainbow").  The Court found Rainbow infringed on FMC's composition of matter patent for the insecticidal active ingredient chlorantraniliprole and a key intermediate to manufacture chlorantraniliprole.

> *The judgement includes a permanent injunction ordering Rainbow to immediately stop manufacturing, selling, offering to sell and using chlorantraniliprole*, upon the effective date of the judgement. . . . Rainbow's infringement had enabled it to unfairly compete in the crop protection market and benefit from FMC's significant investments in this important product.

> "We are pleased with the decision of the Court," said Michael Reilly, FMC executive vice president, general counsel and secretary.  "This decision strengthens FMC's confidence in protecting and enforcing its patents in China.  This result also reinforces the value of our commitment to bring innovation to growers around the world."

> *FMC maintains an extensive patent estate for its proprietary chlorantraniliprole technology, including patents that cover active ingredient*

---

[1]    Emphasis added here and throughout unless otherwise noted.

*composition of matter, manufacturing, formulations and other areas protected by intellectual property laws in the U.S., China, India, and other important agricultural markets throughout the world*. . . .

"*Intellectual property rights are essential for the continued innovation of crop protection solutions* and thereby serve the interest of our growers, customers, investors, employees, suppliers and partners. Infringing, illegal and counterfeit crop protection products not only reduce incentives for investing in innovation, they can pose a health and safety risk for growers and consumers, as well as an environmental hazard," said Reilly. "*FMC is committed to product stewardship, sustainability and vigorously defending our intellectual property. By enforcing our patents, we help keep these illegal products out of the market.*"

27.    On May 10, 2022, FMC issued a press release titled "FMC Corporation obtains pre-suit injunction in China for patent infringement" to inform investors it had obtained a preliminary injunction in China "to stop infringement" of a CTPR patent relating to Rynaxypyr. The release stated in pertinent part as follows:

[T]he Ningbo Intermediate People's Court in Zhejiang Province, China, granted FMC Agro Singapore Pte. Ltd a *pre-suit preliminary injunction to stop infringement of a chlorantraniliprole patent*. Chlorantraniliprole is FMC's leading insecticide ingredient branded as Rynaxypyr® active.

*The pre-suit preliminary injunction restrains Zhejiang Yongtai Technology Co. Ltd. ("Yongtai Technology") from engaging in any activity of offering to sell chlorantraniliprole* until FMC's patent expires, including by doing so at trade fairs.

\*        \*        \*

"The principles decided by the Court are also significant for future infringement actions, as being one of very few cases anywhere in China where a trial court has granted pre-suit injunctive relief under the China Patent Law and standards outlined by the Chinese Supreme Court. The Ningbo Intermediate People's Court determined that Yongtai Technology's infringing acts violated the China Patent Law and created a need for urgent relief to protect FMC's patent rights."

For nearly four decades, FMC has provided proprietary insect, disease and weed control technologies to ensure that Chinese farmers have access to world-class product technologies. . . .

"*Our intellectual property rights are an essential tool to drive innovation and continued investment in the Chinese crop protection market*," said Pramod Thota, interim president for FMC's Asia Pacific Region and president of FMC U.S.A.

**Unbeknownst to Investors, During the Class Period**
**FMC Was Unable to Protect Its Patents and Prevent**
**Generic Competition**

28.    Even though FMC may have been initially successful in enforcing certain patent rights, by 2022 FMC began losing in court, was unable to enforce its patents in key markets around the world, and, as a result, its business had become exposed to a wave of generic competition. Defendants, however, hid these facts from investors during the Class Period.

29.    Beginning in 2022, FMC lost key patent disputes and faced fierce generic competition from well-capitalized entities in India and China.  During the Class Period, competitors in India and China were selling generic diamides at prices of up to 80% below the cost of FMC's branded diamide products.  Dozens of companies had registered generic CTPR for manufacture, export, distribution, or sale in FMC's key Asian markets.

30.    For example, in September 2022, FMC's competitor Natco successfully vacated a prior injunction which had prohibited it from selling generic CTPR in India.  On September 19, 2022, the Delhi High Court ruled in favor of Natco and against FMC and found "no case of infringement is made out," vacating the injunction that had previously prohibited Natco from launching generic CTPR.  FMC ultimately appealed that ruling and lost.

31.    FMC lost other patent disputes in India as well, including on November 14, 2022 when the Delhi High Court ruled against FMC in a patent dispute with competitor GSP Crop Science.  In that case, the Delhi High Court found FMC "guilty of suppressing material facts and misleading the Court" and the "patent office," and rejected FMC's "attempt for evergreening CTPR . . . even though, the product patent . . . has expired and therefore, fallen into public domain."

32.    In stark contrast to how FMC had publicized its patent *victories* in India, FMC failed to disclose these devastating court *losses* in India to investors during the Class Period.

33.     Generic competitors in India moved quickly after FMC's losses in court. FMC's four largest competitors in India – Best Agro, Natco, GSP Crop Science, and Insecticides India Ltd. – had each begun selling generic CTPR in 2022 or 2023 and collectively forecasted to generate up to $100 million in sales of generic CTPR between 2023 and 2024, amounting to up to *50%* of FMC's market share in India.

34.     As in India, FMC lost important legal disputes in China, causing FMC to be exposed to generic competitors who sold similar products at prices 80% below FMC's branded diamide products.

35.     Defendants were aware that a loss of sales to generic competitors in India and China would be extremely detrimental to FMC's business. For example, India was described by defendant Douglas as a "very, very important market" on FMC's May 2023 conference call discussing FMC's earnings. Similarly, FMC generated approximately $100 million in revenue in China in 2022 so generic competition in that country would be highly detrimental to FMC's business. Additionally, due to China's importance as a manufacturing hub, competing products could be manufactured in China with generic diamides and exported to purchasers in other countries, thereby negatively affecting FMC's business globally.

**FMC's Business in Brazil Suffered from a Prolonged**
**Macro-Economic Downturn and Generic Competition**
**Was Poised to Make the Situation Worse**

36.     Brazil, which accounted for approximately 28% of FMC's $2.8 billion in revenue during 2022, was FMC's largest market. During the Class Period, unbeknownst to investors, FMC's business in Brazil was deteriorating due to a contraction in the Brazilian agrochemical market and a weakening of the creditworthiness of FMC's customers.

37. During 2023, favorable market conditions which in prior years had almost doubled the size of the agricultural chemical market in Brazil reversed, creating downward pricing pressures. Previous supply shortages vanished, and prices fell.

38. Notwithstanding these adverse facts, FMC claimed the Company was insulated from deflationary pressures because of the high quality of FMC's products, its protection against generic competitors, and its ability to raise prices. FMC specifically assured investors it was insulated from generic competition in Brazil until at least 2026 because it had enjoined generic competitors. As FMC stated in a presentation to investors on August 4, 2021: "First Potential Competitive Sales of [CTPR] Not expected earlier than Q3 2026" and "[p]atent timelines longer in Brazil compared to most other countries." These statements remained alive and uncorrected at the start of the Class Period. Unbeknownst to investors, however, generic competitors were getting ready to launch in Brazil by the second half of 2023 – *three years earlier than represented by defendants*.

39. In Brazil, a generic competitor needs the approval of three Brazilian regulators to sell generic diamides in competition with FMC: (i) ANVISA (health and safety); (ii) IBAMA (environmental); and (iii) MAPA (agriculture). In June 2019, the Chinese company Rainbow Agro, one of the world's largest chemical crop protection providers, applied for registrations of generic CTPR with Brazilian regulators. While FMC was initially successful in blocking Rainbow Agro's registration, on August 29, 2022, Rainbow Agro sued the Brazilian regulators in federal court in Brazil. On September 16, 2022, the Brazil court ruled in favor of Rainbow Agro and ordered Brazilian regulatory agencies to act on its registration applications for generic CTPR. MAPA completed its evaluation on or about April 6, 2023 and ANVISA completed its evaluation on or about July 19, 2023. Therefore, Rainbow Agro (and others) would be able to sell generic CTPR once IBAMA approved Rainbow Agro's application.

40.    In response to these rulings, FMC filed a motion in July 2023 seeking to delay final regulatory approval – which defendants knew represented the last hurdle before generic competitors entered the Brazilian market.  Generic competitors, including Rainbow Agro and Natco, were poised to enter the market if FMC lost its motion.  Accordingly, FMC's business in Brazil was set to suffer as soon as the second half of 2023 as a result of a wave of generic competitors.  Defendants, however, hid these adverse facts from investors.

**DEFENDANTS' MATERIALLY FALSE AND MISLEADING
STATEMENTS AND OMISSIONS ISSUED DURING THE CLASS PERIOD**

41.    The Class Period starts on November 1, 2022.  On that date, FMC issued a press release announcing its third quarter financial results for the quarter ended September 30, 2022.  In the release, FMC reported "reported third quarter 2022 revenue of $1.38 billion, an increase of 15 percent versus third quarter 2021, ***driven by strong volume and pricing***."  The release quoted defendant Douglas, who stated in pertinent part as follows:

> "FMC's strong growth continued in the third quarter driven by ***a robust start to the Latin American season and continued pricing actions across all regions***.  In addition, we are starting to see the benefits of our expanded market access in several key geographies.  EBITDA results were down versus the prior year as expected with peak cost headwinds in the quarter," said Mark Douglas, FMC president and chief executive officer.

42.    On November 2, 2022, FMC filed with the SEC its quarterly report on Form 10-Q for the quarter ended September 30, 2022 (the "3Q22 Form 10-Q"), which reiterated the financial results from the November 1, 2022 press release and was signed by defendant Sandifer.  The 3Q22 Form 10-Q stated in pertinent part as follows:

> ***Enforcement of intellectual property rights*** – The composition of matter patents on our Rynaxypyr® active ingredient are nearing their expiration in several key countries.  ***We have a broad estate of additional patents regarding the production of Rynaxypyr® active ingredient, as well as trademark and data exclusivity protection in certain countries that extend well beyond the active ingredient composition of matter patents***.  (See "Diamide Growth Strategy" and "Patents, Trademarks and Licenses" in Item 1 of our 2021 Form 10-K.)  ***We intend to strategically and vigorously enforce our patents and other forms of intellectual property and have done so already against several third parties***. . . .  Patents may be

challenged in the courts, as well as in various administrative proceedings before U.S. or foreign patent offices, and may be deemed unenforceable, invalidated or circumvented. We are currently and may in the future be a party to various lawsuits or administrative proceedings involving our patents. Such challenges can result in some or all of the claims of the asserted patent being invalidated or deemed unenforceable. Two such proceedings in China are currently on appeal. (See Part II, Item 5 of this Form 10-Q for additional information.) In such circumstances, an adverse patent enforcement decision which could lead to the entry of competing chlorantraniliprole products in relevant markets may materially and adversely impact our financial results.

43.     The 3Q22 Form 10-Q failed to discuss the Company's recent litigation losses in India

and minimized its losses in China, stating in pertinent part as follows:

As noted in our 2021 Form 10-K, in early 2022, we received notice that certain third parties were seeking to invalidate our Chinese patents on a certain intermediate involved in producing chlorantraniliprole and a process to produce chlorantraniliprole; *we intend to defend vigorously the validity of both patents*. During the third quarter of 2022, the China Patent Review Board issued rulings which held that the two challenged patents were not valid in China. *We believe the Review Board's decisions are seriously flawed both on procedural and substantive ground and we have filed appeals*. Under Chinese law, the patents remain valid but are not enforceable pending appeal. *Given the unique and specific Chinese patent law issues at issue in that situation, we do not believe that the China Patent Review Board's decisions would materially adversely impact our enforcement of similar patents in other countries*. . . .

The composition of matter patent that covers chlorantraniliprole (also known as Rynaxypyr® active) expired in a number of countries in August 2022; this patent will continue to remain in force in other countries throughout the world, expiring on a country-by-country basis at various dates through 2027. *As described in our 2021 Form 10-K, we are deploying a multi-pronged strategy to defend that business after active ingredient patent expiration, including enforcement of our patents in many countries which continue to cover chemical intermediates and manufacturing processes that are essential in the production of chlorantraniliprole*.

44.     On February 7, 2023, FMC issued a press release announcing its fourth quarter and

full-year 2022 financial results and provided guidance for "strong growth for 2023" purportedly

based on "pricing momentum and robust demand." The release stated: "For the full year, FMC

reported revenue of $5.8 billion, an increase of 15 percent compared to 2021" and "[o]n a GAAP

basis, the company reported full-year net income of $742 million, up 1 percent versus the previous

year, and consolidated earnings of $5.81 per diluted share, a year-over-year increase of 1 percent."

The release also forecasted "[f]ull-year 2023 revenue . . . to be in the range of $6.08 billion to $6.22 billion, representing an increase of 6 percent at the midpoint versus 2022, ***driven by strong pricing in all regions*** and growth in volume driven by new launches and market access."

45.    Defendant Douglas was quoted in the release discussing FMC's financial results and guidance for 2023, stating in pertinent part as follows:

> "Full-year results were driven by significant volume and ***price gains in every region***.  Our continued focus on new product development, commercial launches and market access investments delivered record results in 2022."

> *            *            *

> "***We anticipate a positive market backdrop for 2023*** that will ***support our pricing actions as well as continued healthy demand*** for FMC's synthetic and biological product portfolios."

46.    The next day, on February 8, 2023, FMC held a conference call with analysts and investors to discuss the Company's financial results disclosed in the February 7, 2023 press release. The slide show presentation distributed for the conference call contained a "2023 Market and FMC Outlook" page which stated in pertinent part that "FMC Growth Outlook . . . ***Pricing momentum continues***."  The "Takeaway" section of the slide show stated that "FMC ***grows topline*** above market rate with ***margin expansion in H2 2023***."  Additionally, the "FY 2023 Financial Outlook" page in the presentation stated, in pertinent part: "REVENUE DRIVERS . . . ***Targeting*** mid-single digit ***price increases***"; "ADJ. EBITDA DRIVERS . . . Price in primary driver of EBITDA growth"; and "ADJ. EPS DRIVERS . . . EBITDA growth is primary contributor."

47.    On February 21, 2023, defendant Sandifer presented at the Citi Global Industrial Tech and Mobility Conference and discussed FMC's purported patent victories without disclosing the Company's losses or the actual threat of increased generic competition, stating in pertinent part as follows:

> [***Prashant N. Juvekar, Citigroup Inc., Research Division*** – Global Head of Chemicals & Agriculture Research and MD:]  Can you just talk about how do you see the cadence of these expirations and what can you do to extend a life?

[*Andrew D. Sandifer, FMC Corporation* – Executive VP & CFO:] . . . But just to give you the big picture, the diamides, Rynaxypyr and Cyazypyr, we have 30 patent families include about 1,000 patents, both granted and applied for that cover broad array of issues that protect the diamides. The one that gets the most initial focus is the composition of matter patents, is literally the patent on the molecule itself. Some of those patents have already started to expire for Rynaxypyr. In fact, in several countries, China, India and certain Eastern European countries, the patent for Rynaxypyr expired in 2022.

*Now, that's just one of a small part of the total layer of protections we have around these molecules. We also have patents on the manufacturing process to make Rynaxypyr and Cyazypyr. We have patents on the intermediates, the composition amount of patterns on the intermediate materials that are used in that process. So for example, for Rynaxypyr, it's a 16-stage synthesis process.*

*. . . We have patents on their composition of matter. We have patents on the process to make several of those as well. We also have patents on formulations on how that product is finally formulated to take to market. So we've had this broad set of patent protections. We are also provided some protection to the use of our regulatory data and the way registrations are managed in different countries. They give us protection that continues well until the end of this decade and, in some cases, a bit longer*.

And certainly, with – speaking directly to Rynaxypyr, which has earlier expiration dates, Cyazypyr goes a little bit further. But as you pointed to, P.J., it's not just relying on the patents themselves. And obviously, we've been very aggressive in enforcing the patents. *We have won cases for infringement in both China and India and continue to aggressively defend our patents*. But we've also engage[d] partners and brought other people in the business ahead of any kind of patent expiration. *We don't believe that in our industry, in crop protection, that there really is a patent cliff. It's more of a long plateau as you transition from being a fully-patented to a post-patented life*.

48.    On February 24, 2023, FMC filed with the SEC its Form 10-K for the fiscal year ended December 31, 2022 (the "2022 Form 10-K"), which was signed and certified by defendants Sandifer and Douglas and contained the financial results announced in the February 7, 2023 press release. The 2022 Form 10-K discussed FMC's "Diamide Growth Strategy" and the purported difficulty third parties would have in launching competing products, stating in pertinent part as follows:

Our product portfolio features two key diamide-class molecules – Rynaxypyr® (chlorantraniliprole) and Cyazypyr® (cyantraniliprole) actives – with combined annual revenues of approximately $2.1 billion in 2022. These two molecules are industry-leading in terms of performance, combining highly effective

low dose rates with fast-acting, systemic, long residual control.  These attributes quickly **established Rynaxypyr® active as the world's leading insect control technology and we expect it to continue a strong growth trajectory notwithstanding the expiration of composition of matter patents** covering Rynaxypyr® active in certain countries which started in late 2022.  Our Cyazypyr® active, a second-generation diamide, is growing quickly as we obtain more product registrations.  **We expect Cyazypyr® active to continue to grow strongly notwithstanding the expiration of its active ingredient composition of matter patents starting in the mid-2020s**.  This expectation is based not only on our broad patent estate and the timing of key patent milestones, but also on other critical elements that will allow FMC to continue to profitably grow the diamide franchise well beyond the expiration of key patents.   Some of the critical elements supporting diamide growth include registration and data protection, commercial strategies, brand recognition, as well as manufacturing and supply chain complexity and FMC efficiencies.

*Patents and Trade Secrets.* . . .  FMC's process patents cover the manufacturing processes for both active ingredients – chlorantraniliprole and cyantraniliprole – as well as key intermediates that are used to make the final products. . . .  **Many of these intermediate process patents run well past the expiration of the composition of matter patents, and in some cases stretch until the end of this decade**.  Third parties that intend to manufacture and sell generic chlorantraniliprole or cyantraniliprole and rely on FMC's extensive product safety data will be required to demonstrate that their product has an equivalent regulatory safety profile as FMC's Rynaxypyr® and Cyazypyr® actives.  **To meet regulatory requirements for such difficult-to-manufacture molecules, we believe that third parties will have to produce these active ingredients using the same processes that are patented by FMC and if so, would be infringing before patent expiration and subject to our challenge for infringement**.

*     *     *

**Patents, Trademarks and Licenses**

As an agricultural sciences company, FMC believes in innovation and in protecting that innovation through intellectual property rights.  **We own and license a significant number of U.S. and foreign patents, trademarks, trade secrets and other intellectual property that are cumulatively important to our business**. . . .  The FMC **intellectual property estate provides us with a significant competitive advantage** which we seek to expand and renew on a continual basis.

49.     The 2022 Form 10-K also discussed FMC's efforts to defend its patents and described "**multiple favorable judgments** and settlements, including **in India and China**," but failed to disclose FMC's litigation losses in India or the materially increased threat of generic competition for FMC's products around the world, stating in pertinent part as follows:

We actively monitor and manage our patents and trademarks to maintain our rights in these assets and we strategically take aggressive action when we believe our intellectual property rights are being infringed. ***During 2022, we initiated proceedings to enforce several of our patents and trademarks against generic producers and infringers, resulting in multiple favorable judgments and settlements, including in India and China***. In early 2022, we received notice that certain third parties are seeking to invalidate our Chinese patents on a certain intermediate involved in producing chlorantraniliprole and a process to produce chlorantraniliprole; we intend to defend vigorously the validity of both patents. During the third quarter of 2022, the China Patent Review Board issued rulings which held that the two challenged patents were not valid in China. We believe the Review Board's decisions are seriously flawed both on procedural and substantive ground and we have filed appeals.

50.    On March 1, 2023, FMC presented at the Bank of America Global Agriculture and Materials Conference. At the conference, defendant Douglas discussed FMC's legal victories in India and China but failed to disclose the relevant court losses and regulatory setbacks suffered by the Company when enforcing FMC's intellectual property and downplayed the threat of potential generic competitors, stating in pertinent part as follows:

> [***Stephen V. Byrne, BofA Securities, Research Division*** – MD in Americas Equity Research & Research Analyst:] And then recall ***you have a couple of legal battles in India*** for some generic product. What's the status of those patent infringement cases?

> [***Mark A. Douglas, FMC Corporation*** – President, CEO & Director:] Yes. There's a ***couple of cases in India that we recently won***, a couple of cases in China as well.

51.    Defendant Douglas further stated that even though the original patent for diamides had expired, FMC nonetheless would not face significant risks from generic competition until "the end of this decade" because of the strength of the rest of the Company's patent portfolio, stating in pertinent part as follows:

> [***Stephen V. Byrne, BofA Securities, Research Division*** – MD in Americas Equity Research & Research Analyst:] Okay. I'd like to drill in the diamides a little bit. Where are we at in the patent expiry outlook over the next couple of years and your preparedness for that given your existing contracts with some of the really big crop chemical peers?

> [***Mark A. Douglas, FMC Corporation*** – President, CEO & Director:]

*     *     *

There are also significant patents related to the whole process of manufacturing. These molecules are 15 or 16 synthetic steps, and we have many of those steps patented. *I think it's worth noting today that the only legal material that's available is from FMC, even though the original patent has come off*. Why is that? Because of the strength of the rest of the patent portfolio.

*     *     *

Last year, diamides grew about 7%. . . . They have been around for almost 20 years now. So that we talk about them as being new molecules, new technology, and they are, but they're coming off the end of their patent. *And you should expect at some point towards the end of this decade, you will see generic manufacturing*. That is what happens. So we're ready for that. We anticipated and we'll continue to invest in the diamides.

52.     On May 1, 2023, FMC issued a press release announcing its first quarter financial results for the period ended March 31, 2023. The release reported "[r]evenue of $1.34 billion, flat versus Q1 2022 and up 4 percent organically," "[c]onsolidated GAAP net income of $196 million," and "[a]djusted earnings per diluted share of $1.77, down 6 percent versus Q1 2022." The release also provided the Company's full-year 2023 outlook, stating in pertinent part as follows:

**Outlook**

The company is forecasting full-year 2023 revenue to be in the range of $6.08 billion to $6.22 billion, unchanged since the last guidance and representing an increase of 6 percent at the midpoint versus 2022. *FMC is raising its full-year adjusted EBITDA guidance by $10 million* at the midpoint. Full-year adjusted EBITDA is now expected to be in the range of $1.50 billion to $1.56 billion, representing 9 percent year-over-year growth at the midpoint based on the first quarter performance, continued pricing gains, positive product mix and projected input cost tailwinds. *2023 adjusted earnings range is also increased to $7.34 to $7.94 per diluted share*, representing a year-over-year increase of 3 percent at the midpoint. The company is maintaining full-year free cash flow guidance in the range of $530 million to $720 million.

Second quarter revenue is expected to be in the range of $1.42 billion to $1.48 billion, which is flat at the midpoint compared to second quarter 2022. *Headwinds from lower volumes in select markets and FX are expected to be offset by gains from pricing actions* and sales of new products. . . .

. . . Continued market access gains and the increased forecast of new product growth *as well as pricing is expected to drive second half revenue growth*.

- 18 -

(Footnote omitted.)

53.    On May 2, 2023, FMC held a conference call with analysts and investors to discuss the financial results and outlook reflected in the May 1, 2023 press release.  The slide show presentation distributed for the conference call contained a "Q2 2023 Financial Outlook" page which stated in pertinent part: "REVENUE DRIVERS . . . Higher prices more than offsets lower volumes"; "ADJ. EBITDA DRIVERS . . . Price in primary driver of EBITDA"; and "ADJ. EPS DRIVERS . . . Flat EBITDA."  The "FY 2023 Financial Outlook Update" page of the presentation similarly stated in pertinent part: "REVENUE DRIVERS . . . Price increases weighted to H1 . . . Continued focus on channel inventory in India"; "ADJ. EBITDA DRIVERS . . . Expanding margins via price increases and improved product mix from new products";  and "ADJ. EPS DRIVERS . . . EBITDA growth." The presentation also contained a slide titled "Adjusted EBITDA Growth Expected to be Weighted Toward Second Half," which stated that FMC was "[t]argeting mid-to-high single digit price increases" for "H1 ADJ. EBITDA" and "[t]argeting low-single digit price increases" for "H2 ADJ. EBITDA."  (Footnotes omitted.)  The slide show also highlighted FMC's purported "[v]olume growth driven by new products in North and Latin America" and the "[m]argin expansion" purportedly being enjoyed by the Company.

54.    Also on May 2, 2023, FMC filed with the SEC its Form 10-Q for the first quarter of 2022 which was signed by defendant Sandifer and reiterated the financial results contained in the May 1, 2023 press release.

55.    On or about May 9, 2023, FMC presented at the Goldman Sachs Industrials & Materials Conference.  During that conference, defendant Sandifer minimized generic competition of diamides, claiming that "***there's not a single legal competitor in Rynaxypyr in the world today***" and that "there are ***no current legal entrants***" in either India or China, and stating in pertinent part as follows:

[*Adam L. Samuelson, Goldman Sachs Group, Inc.*, Research Division – Equity Analyst:] [Y]our biggest business is your – it's a diamide insecticide franchise. It's over third of your revenues, has carried above average margins, it does have kind of a patent [estate] that is gradually rolling off over the next several years. How do we think about that patent estate rolling off and kind of competition and pricing kind of factoring into that medium-term growth and the confidence that you have that your company cannot just grow sales, but EBITDA . . . .

[*Andrew D. Sandifer, FMC Corporation* – Executive VP & CFO:] . . . Some of the earliest patents [for diamides] which are around the composition of matter, composition of matter of the fundamental active ingredient molecules started rolling off last year.

Despite that, **there's not a single legal competitor in Rynaxypyr in the world today** that said differently, that isn't buying it from us. Now there are illegal competitors and have been since before we bought the business. So there's been a legal [sic] material, particularly in China and India, always. **But there are no current legal entrants in either of those markets where . . . the initial composition of matter patents have expired**. And that's in part because that's just the beginning of the story around the patent protection.

56.     The statements referenced in ¶¶41-55 were materially false and/or misleading when made because they failed to disclose the following adverse facts pertaining to the Company's business, operations, competitors, and key markets, which were known to defendants or recklessly disregarded by them as follows:

(a)     that FMC had lost key legal disputes over its patents in India and competitors were selling generic diamide products in India;

(b)     that FMC had misleadingly downplayed the effect of the China Patent Office's rulings invalidating certain key FMC patents in the country;

(c)     that generic competitors to FMC in Brazil had won important regulatory approvals and could potentially sell generic diamides in the country as soon as the second half of 2023;

(d)     that numerous competitors were manufacturing and selling generic versions of FMC's top selling insecticide product in India and China at much lower prices than being charged by FMC;

(e)     that FMC was not in a position to raise prices on its branded diamide products to increase its revenues or margins in the key markets of India, China, or Brazil; and

(f)     that, based on the foregoing, defendants lacked a reasonable basis for their positive statements about FMC's business, operations, and future financial prospects.

57.     Even though the Company raised its full-year 2023 outlook in May 2023, on July 10, 2023, before the market opened, FMC issued a press release revising downward the Company's outlook for the second quarter and full-year 2023.  The release stated in pertinent part as follows:

> FMC Corporation today provided an update for its expectations on the second quarter and full-year 2023 outlook Revenue in the second quarter is now expected to be between $1.00 billion and $1.03 billion.  Adjusted EBITDA is expected to be in the range of $185 million to $190 million.  The revised guidance is driven by substantially lower-than-expected volumes due to an abrupt and significant reduction in inventory by channel partners, which only became evident towards the end of May and continued through the remainder of the quarter in North America, Latin America and EMEA.
>
> Based on current channel dynamics, the Company is revising its full-year financial outlook with revenue now expected to be $5.20 billion to $5.40 billion.  Adjusted EBITDA for the full year is now expected to be $1.30 billion to $1.40 billion.
>
> "Towards the end of May, we experienced unforeseen and unprecedented volume declines in three out of our four operating regions, as our channel partners rapidly reduced inventory levels," said Mark Douglas, FMC president and chief executive officer.  "Our full-year outlook for revenue and adjusted EBITDA has been revised to reflect these channel dynamics and their impact to volumes, as well as the benefit from improved input costs and the significant operating cost mitigation actions we have already implemented.["]
>
> "Even as we manage through this market contraction and significant inventory reduction by our channel partners, on-the-ground consumption of our products remains strong and at similar levels to last year," Douglas said.

58.     In response to the Company's announcements on July 10, 2023, the price of FMC common stock price fell $11.62 per share, or 11%, to close at $92.63 per share on July 10, 2023 on heavy trading volume of over eight million shares traded.  However, because defendants failed to disclose the truth about FMC's legal losses and regulatory setbacks and the threat of generic competition in the key markets of India, China, and Brazil and continued to make materially false

and misleading statements and omissions as detailed herein, the price of FMC stock remained artificially inflated.

59.     On August 2, 2023, FMC announced second quarter 2023 results and confirmed its full-year outlook in a press release, stating in pertinent part as follows:

> FMC Corporation today reported second quarter 2023 revenue of $1.01 billion, down 30 percent versus second quarter 2022, and down 28 percent organically.  On a GAAP basis, the company reported earnings of $0.24 per diluted share in the second quarter, a decrease of 77 percent versus second quarter 2022.  Second quarter adjusted earnings were $0.50 per diluted share, down 74 percent versus second quarter 2022.
>
> *     *     *
>
> "FMC delivered second quarter results in-line with recently adjusted guidance expectations.  Active inventory management by growers and the distribution channel drove unprecedented volume declines and as a result we now expect the overall crop protection market to contract high-single-digits to low-double-digits percent this year despite steady on-the-ground usage by growers," said Mark Douglas, FMC president and chief executive officer.
>
> *     *     *
>
> In Latin America, revenue was down 38 percent versus the prior-year period driven by significantly lower volumes as destocking was amplified by a historic drought in southern Brazil and Argentina.  Sales in Asia declined 29 percent (down 23 percent organically) year-over-year.  As expected, India continued to manage high channel inventory and was impacted by challenged growing conditions in most of the country.

60.     The August 2, 2023 press release provided FMC's 2023 full-year and second half outlook, stating in pertinent part as follows:

> **Full Year 2023 Outlook**
>
> Consistent with the company's release on July 10, FMC is forecasting full-year 2023 revenue to be in the range of $5.20 billion to $5.40 billion, reflecting a 9 percent decline at the midpoint versus 2022 and full-year adjusted EBITDA is expected to be in the range of $1.30 billion to $1.40 billion, representing 4 percent decline year-over-year at the midpoint.  The forecast for the 2023 adjusted earnings range is lowered to $5.86 to $6.80 per diluted share, representing a year-over-year decrease of 15 percent at the midpoint.
>
> *     *     *

**Second Half Outlook**

Sales in the second half of 2023 are expected to be in the range of $2.84 billion to $3.04 billion, representing a 2 percent decrease at the midpoint compared to the same period last year.  Adjusted EBITDA is forecasted to be $751 million to $851 million, representing 16 percent growth at the midpoint versus second half 2022.  Forecasted input cost tailwinds, operating expense discipline, anticipated growth of new products and ***projected pricing gains are expected to more than offset the adjusted EBITDA impact from anticipated volume decline in the second half***.

(Footnotes omitted.)

61.     On August 3, 2023, FMC filed with the SEC its Form 10-Q for the second quarter of 2023 which was signed by defendant Sandifer and reiterated the financial results reported in the August 2, 2023 press release.

62.     On September 7, 2023, before the market opened, an investor firm named Blue Orca Capital issued a detailed research report disclosing publicly, for the first time, that FMC faced substantial generic competition in India, China, and Brazil due in part to FMC's inability to successfully defend its diamides patents.  The report also disclosed that FMC faced demand issues and downward pricing pressures in Brazil.  The facts contained in the report were well substantiated and supported by numerous citations to FMC's SEC filings and conference call transcripts, witness interviews, and documents obtained from India, China, and Brazil, including foreign language news articles and documents obtained from courts and regulatory agencies.  That research report disclosed, among other things, the following:

We are short FMC Corporation ("FMC" or the "Company") because FMC has concealed from investors that it has suffered a recent string of stunning legal defeats around the globe that have enabled competitors to now launch competing generics at prices up to 80% below the price of FMC's flagship insecticide product.  Contrary to the Company's claims, FMC's process patents do not protect its flagship product from generic competition.  **The dam has broken**.

. . . Despite the expiration of the composition patents on FMC's diamides, **FMC tells investors it will not face generic competition on its flagship products until 2026 at the earliest** because FMC still holds a suite of "process" patents, which FMC claims will bar generic entrants for the next several years.  Absurdly,

FMC even tells investors that "there is not a single legal competitor . . . in the world today." **This is simply not true**.

> In our opinion, FMC continues to misrepresent to investors that it will not face generic competition for its flagship diamides when in reality, as a result of devasting [sic] recent legal defeats, generics have already launched in key markets of India and China and are on the precipice of launching in Brazil. Our investigation found dozens of legal competitors, many industry heavyweights, who are, right now, manufacturing and selling generic versions of FMC's top selling insecticide product in FMC's most important markets **at much lower prices**. In China for example, competitors are selling generics for up **80% below the price of FMC's branded equivalent. In FMC's key market of India, the Delhi High Court recently found FMC guilty of misleading the court and the patent office, and well-capitalized competitors have now launched generic versions of FMC's top selling CTPR product** at cut prices and are already projected to take 40-50% of FMC's CTPR diamide market share in India in the next year.

> This could not have come at a worse time for FMC, as its revenues have already been crushed by a global inventory glut. FMC just reported a 30% YoY revenue decline before generic competition is set to hit key markets in full force. In our view, this has all the makings of a 2H 2023 disaster, not a rebound.

(Emphasis in original.)

63.     In response to the news, the price of FMC common stock fell from $82.19 per share on September 6, 2023 to close at $76.10 per share on September 7, 2023, a decline of $6.09 per share, or 7%, on heavy trading volume of over seven million shares traded. Over the next two trading days the price of FMC common stock continued to decline, closing at $73.87 per share on September 11, 2023. However, because defendants failed to disclose the truth about FMC's legal losses and regulatory setbacks and the threat of generic competition in the key markets of India, China, and Brazil, and continued to make materially false and misleading statements and omissions as detailed herein, the price of FMC stock remained artificially inflated.

64.     On September 7, 2023, FMC issued a press release titled "FMC Corporation response to inaccurate short-seller report," stating in pertinent part as follows:

> FMC Corporation announced that the report published today by short-seller Blue Orca Capital made misleading and factually inaccurate statements regarding FMC's patents for its diamide insecticide technology and inaccurately speculated on the strength of FMC's business. As acknowledged by Blue Orca, it is a biased opinion piece.

FMC has always been clear and transparent about its diamide growth strategy. The company has consistently disclosed material developments in diamide litigation in SEC filings. The Blue Orca report contains quotes and information that have been taken out of context, are factually incorrect or do not reflect the multiple dimensions of the FMC diamide growth strategy.

FMC is disappointed a short seller firm would publish a misleading report that contains such speculation and factually incorrect statements. FMC will assess the biased, inaccurate report and take appropriate steps.

65.     Then, before the market opened on October 23, 2023, FMC issued a press release revising downward the Company's third quarter 2023 expectations and full-year 2023 outlook due to a sudden and dramatic slowdown in the Company's Brazilian market, stating in pertinent part as follows:

FMC Corporation today provided an update on third quarter expectations compared to its previously provided outlook. Revenue in the third quarter is now expected to be $982 million with adjusted EBITDA of $175 million and adjusted earnings per share of $0.44. The revised outlook is mainly driven by substantially lower sales volumes in Latin America, particularly destocking in Brazil and to a lesser degree drought in Argentina.

\*     \*     \*

|  | FY 23 | Q4 2023 |
|---|---|---|
| **Revenue** | $4,480M to $4,720M | $1,139M to $1,379M |
| **Adjusted EBITDA** | $970M to $1,030M | $246M to $306M |

"During the third quarter we observed continued channel destocking in all regions; *however, the magnitude of the destocking in Brazil was much greater than we had anticipated*," said Mark Douglas, FMC president and chief executive officer. "While application of products by growers remains stable, significant global destocking impacts are expected to persist into next year and we have adjusted our full year outlook accordingly. ***With destocking conditions not expected to improve in the near-term, we have initiated an immediate restructuring process for our operations in Brazil*** and have launched a broader, more comprehensive process to review and adjust our total Company cost structure. We will discuss these actions and our 2024 outlook at our Investor Day on November 16th."

66.     On this news, the price of FMC common stock fell from $66.95 per share on October 20, 2023 to close at $58.12 per share on October 23, 2023, a decline of $8.83 per share, or 13%, on

heavy trading volume of nearly nine million shares traded.  Over the next two trading days the price of FMC common stock continued to decline, closing at $55.77 per share on October 25, 2023.

67.    On October 30, 2023, FMC issued a press release providing the Company's third quarter financial results.  The release stated that FMC had suffered a 29% revenue decline in the quarter, primarily due to much lower customer demand in Brazil.  On a related earnings call, defendant Douglas also acknowledged that sales were down 28% in Asia largely due to lower customer demand in India.

68.    On this news, the price of FMC common stock fell from $57.96 per share on October 30, 2023 to close at $53.20 per share on October 31, 2023, a decline of $4.76 per share, or 8%, on heavy trading volume of over three million shares traded.

69.    As a result of defendants' fraudulent scheme, as detailed herein, plaintiff and other members of the Class suffered substantial economic losses and damages under the federal securities laws.

## ADDITIONAL SCIENTER ALLEGATIONS

70.    As alleged herein, defendants acted with scienter in that defendants knew, or recklessly disregarded, that the public documents and statements they issued and disseminated to the investing public in the name of the Company, or in their own name, during the Class Period were materially false and misleading.  Defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements and documents as primary violations of the federal securities laws.  Defendants, by virtue of their receipt of information reflecting the true facts regarding FMC, and their control over and/or receipt and/or modification of FMC's materially false and misleading statements, were active and culpable participants in the fraudulent scheme alleged herein.

71.     Defendants knew and recklessly disregarded the false and misleading nature of the information they caused to be disseminated to the investing public.  The fraudulent scheme described herein could not have been perpetuated during the Class Period without the knowledge and complicity of, or at least the reckless disregard by, personnel at the highest levels of the Company, including the Individual Defendants.  In addition, the fraudulent scheme involved the Company's most important international markets, which were a focus of the Individual Defendants during the Class Period and critical to the Company's overall business strategy and financial performance.  The Individual Defendants held themselves out to investors as the persons most knowledgeable about FMC's efforts to combat generic competition and spoke on this topic during investor meetings and presentations.

72.     The Individual Defendants, because of their positions with FMC, controlled the contents of FMC's public statements during the Class Period.  The Individual Defendants were each provided with or had access to the information alleged herein to be false and misleading prior to or shortly after its issuance and had the ability and opportunity to prevent its issuance or cause it to be corrected.  Because of their positions and access to material, non-public information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations that were being made were false and misleading.  As a result, each of the defendants is responsible for the accuracy of FMC's corporate statements and is, therefore, responsible and liable for the representations contained therein.

73.     Throughout the Class Period, the Individual Defendants held themselves out as the persons most knowledgeable about the Company's revenue, earnings, patents, and key markets, and made repeated representations to investors in SEC filings, conference calls, and Company-issued press releases regarding these topics based on this purported knowledge.  Furthermore, the topics

involved the Company's most important issues and were closely watched by the Individual Defendants, and the Individual Defendants signed certifications personally attesting that the information misrepresented to the market, as detailed herein, was true, accurate, and free from fraud.

74.    The scienter of defendants is underscored by the certifications of the Individual Defendants mandated under the Sarbanes-Oxley Act of 2002, which acknowledged their responsibility to investors for establishing and maintaining controls to ensure that material information about FMC was made known to them and that the Company's disclosure-related controls were operating effectively.

## LOSS CAUSATION/ECONOMIC LOSS

75.    During the Class Period, as detailed herein, defendants made false and misleading statements and engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of FMC common stock and operated as a fraud or deceit on Class Period purchasers of FMC common stock by misrepresenting the value of the Company's business and prospects.  As defendants' misrepresentations and fraudulent conduct became apparent to the market, the price of FMC stock fell precipitously as the prior artificial inflation came out of the stock's price.  As a result of their purchases of FMC common stock during the Class Period, plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## NO SAFE HARBOR

76.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the

statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements were made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of FMC who knew that those statements were false when made.

### APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET DOCTRINE

77.     At all relevant times, the market for FMC common stock was an efficient market for the following reasons, among others:

(a)     FMC common stock met the requirements for listing, and was listed and actively traded on the NYSE, a highly efficient and automated market;

(b)     as a regulated issuer, FMC filed periodic public reports with the SEC and the NYSE;

(c)     FMC regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d)     FMC was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace; and

(e)     As a result of the foregoing, the market for FMC common stock promptly digested current information regarding FMC from all publicly available sources and reflected such information in the prices of the common stock.  Under these circumstances, all purchasers or acquirers of FMC common stock during the Class Period suffered similar injury through their

purchase(s) of FMC common stock at artificially inflated prices and a presumption of reliance applies.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
### *AFFILIATED UTE* DOCTRINE

78.     A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because defendants' material omissions during the Class Period caused harm to plaintiff and the Class. Because the complaint alleges defendants' failure to disclose material adverse information regarding FMC – information defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions.

79.     Given the importance of the Class Period material omissions set forth above, that requirement is satisfied here, and, therefore, *Affiliated Ute* provides a separate, distinct basis for finding the applicability of a presumption of reliance.

## CLASS ACTION ALLEGATIONS

80.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all purchasers of FMC common stock during the Class Period (the "Class"). Excluded from the Class are defendants, the officers and directors of the Company, at all relevant times, members of their immediate families, and their legal representatives, heirs, successors, or assigns, and any entity in which defendants have or had a controlling interest.

81.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, FMC common stock was actively traded on the NYSE. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes there are hundreds or thousands of

members in the proposed Class.  Record owners and other members of the Class may be identified

from records maintained by FMC or its transfer agent and may be notified of the pendency of this

action by mail, using the form of notice similar to that customarily used in securities class actions.

82.    Plaintiff's claims are typical of the claims of the members of the Class as all members

of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is

complained of herein.

83.    Plaintiff will fairly and adequately protect the interests of the members of the Class

and has retained counsel competent and experienced in class and securities litigation.

84.    Common questions of law and fact exist as to all members of the Class and

predominate over any questions solely affecting individual members of the Class.  Among the

questions of law and fact common to the Class are:

(a)    whether the Exchange Act was violated by defendants as alleged herein;

(b)    whether statements made by defendants misrepresented material facts about

the business and operations of FMC; and

(c)    to what extent the members of the Class have sustained damages and the

proper measure of damages.

85.    A class action is superior to all other available methods for the fair and efficient

adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the

damages suffered by individual Class members may be relatively small, the expense and burden of

individual litigation make it impossible for members of the Class to individually redress the wrongs

done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §10(b) of the Exchange Act and Rule 10b-5
### Against All Defendants

86.    Plaintiff incorporates ¶¶1-85 by reference herein.

87.     During the Class Period, defendants disseminated or approved the statements specified above, which they knew or deliberately disregarded were false and misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

88.     Defendants violated §10(b) of the Exchange Act and Rule 10b-5 in that they:

(a)     employed devices, schemes, and artifices to defraud;

(b)     made untrue statements of material fact or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)     engaged in acts, practices, and a course of business that operated as a fraud or deceit upon plaintiff and others similarly situated in connection with their purchases of FMC common stock during the Class Period.

89.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for FMC common stock.  Plaintiff and the Class would not have purchased FMC common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by defendants' misleading statements.

## COUNT II

### For Violation of §20(a) of the Exchange Act
### Against All Defendants

90.     Plaintiff incorporates ¶¶1-89 by reference herein.

91.     Defendants acted as controlling persons of the Company within the meaning of §20(a) of the Exchange Act.  By reason of their positions with the Company, the Individual Defendants had the power and authority to cause the Company to engage in the wrongful conduct

complained of herein.  The Company controlled the Individual Defendants and all of its employees.

By reason of such conduct, defendants are liable pursuant to §20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment, as follows:

A.      Determining that this action is a proper class action, designating plaintiff as Lead

Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil

Procedure and plaintiff's counsel as Lead Counsel;

B.      Awarding compensatory damages in favor of plaintiff and the other Class members

against all defendants, jointly and severally, for all damages sustained as a result of defendants'

wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding plaintiff and the Class their reasonable costs and expenses incurred in this

action, including counsel fees and expert fees; and

D.      Awarding such equitable/injunctive or other relief as the Court may deem just and

proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  November 14, 2023              SAXTON & STUMP
                                       LAWRENCE F. STENGEL (PA Bar # 32809)


                                            s/ Lawrence F. Stengel
                                       LAWRENCE F. STENGEL

                                       280 Granite Run Drive, Suite 300
                                       Lancaster, PA  17601
                                       Telephone: 717/556-1000
                                       717/441-3810 (fax)
                                       lfs@saxtonstump.com

- 33 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
SAMUEL H. RUDMAN
EVAN J. KAUFMAN
58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
ekaufman@rgrdlaw.com

ROBBINS GELLER RUDMAN
  & DOWD LLP
BRIAN E. COCHRAN
655 W. Broadway, Suite 1900
San Diego, CA  92101
Telephone: 619/231-1058
619/231-7423 (fax)
bcochran@rgrdlaw.com

CICCARELLO DEL GIUDICE & LAFON
MICHAEL J. DEL GIUDICE
1219 Virginia Street, East, Suite 100
Charleston, WV  25301
Telephone:  304/343-4440
304/343-4464 (fax)

Attorneys for Plaintiff

## CERTIFICATION OF NAMED PLAINTIFF
## PURSUANT TO FEDERAL SECURITIES LAWS

Employer-Teamsters Local Nos. 175 & 505 Health & Welfare Fund ("Plaintiff") declares:

1.    Plaintiff has reviewed a complaint and authorized its filing.

2.    Plaintiff did not acquire the security that is the subject of this action at the direction of plaintiff's counsel or in order to participate in this private action or any other litigation under the federal securities laws.

3.    Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.

4.    Plaintiff has made the following transaction(s) during the Class Period in the securities that are the subject of this action: *See* attached Schedule A.

5.    Plaintiff has not sought to serve or served as a representative party in a class action that was filed under the federal securities laws within the three-year period prior to the date of this Certification except as detailed below:  None.

6.    Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond the Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct. Executed this __12__ day of November, 2023.

Employer-Teamsters Local Nos. 175 & 505
Health & Welfare Fund

By: _____

Its: __CHAIRMAN_____

FMC

**SCHEDULE A**

**SECURITIES TRANSACTIONS**

**Stock**

| Date Acquired | Amount of Shares Acquired | Price |
|---|---|---|
| 03/16/2023 | 302 | $116.36 |
| 08/02/2023 | 627 | $93.15 |
| 09/15/2023 | 570 | $76.34 |

| Date Disposed | Amount of Shares Disposed | Price |
|---|---|---|
| 11/21/2022 | 523 | $127.21 |

Prices listed are rounded to two decimal places.

*Opening position of 1,998 shares.